## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JODIE MOSCONY,<br> *Plaintiff*, | )<br>)<br>) | |
|  v. | )<br>) | CASE NO. 3:20-cv-821 (OAW) |
| IDEXX LABORATORIES, INC. and LIFE<br>INSURANCE COMPANY OF NORTH<br>AMERICA D/B/A CIGNA,<br> *Defendants*. | )<br>)<br>)<br>)<br>) | |

### RULING ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**THIS ACTION** is before the court upon the Motion for Partial Summary Judgment filed by Defendants IDEXX Laboratories, Inc. ("IDEXX") and Life Insurance Company of North America d/b/a CIGNA ("LINA") (collectively, "Defendants"). ECF No. 129. Plaintiff Jodie Moscony suffers from hypersomnia, anxiety, and depression. While she was employed by IDEXX, she took a leave of absence. Shortly after her return, IDEXX terminated her. She alleges IDEXX negligently inflicted emotional distress on her during the termination process. She also alleges LINA, the third-party administrator for leaves of absence, aided and abetted IDEXX in violation of § 46a-60(b)(5) of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-51 et seq. ("CFEPA"). Defendants move for summary judgment on these counts.[1] The court has reviewed the motion, Plaintiff's opposition, ECF No. 132, Defendants' reply, ECF No. 139, and the record in this case. For the reasons discussed herein, the motion is **GRANTED in part** and **DENIED in part**.

---

[1] Apart from these two claims, Plaintiff alleges IDEXX failed to accommodate her disabilities, unlawfully retaliated against her, and terminated her in violation of the CFEPA and the Americans with Disabilities Act, 42 U.S.C. §§ 12102 et seq. ("ADA"); and unlawfully retaliated against her in violation of the Family Medical Leave Act of 1993, 29 U.S.C. § 2611 et seq. ("FMLA"). Defendants do not move for summary judgment on these counts. The court therefore does not address evidence that concerns only these claims.

I. **BACKGROUND**

IDEXX is a company that develops, manufactures, and distributes products and services to veterinary clinics and hospitals.  Pl.'s Local Rule 56(a)(2) Statement ¶ 1, ECF No. 132-1 ("Pl.'s 56(a)(2) Stmt.").   For the relevant time period, LINA administered IDEXX's FMLA, short-term disability, and long-term disability programs.   *Id.* ¶ 5.  According to IDEXX's ADA Accommodations Guide, LINA also played a role in the ADA accommodations process insofar as it provided ADA request forms, collected ADA accommodations paperwork, and submitted the paperwork to the IDEXX Leave of Absence Program Manager.  Pl.'s Ex. 88, ECF No. 132-36 at 10–12 ("ADA Guide").  From there, IDEXX was responsible for managing the accommodation request.  *Id.*

In June 2017, IDEXX hired Plaintiff as a Veterinary Diagnostic Consultant.  *Id.* ¶ 2.  In her role, Plaintiff was responsible for selling IDEXX's products and developing customer relations.   *Id.* ¶ 3.   On May 7, 2018, Plaintiff disclosed her hypersomnia diagnosis to her supervisor, Joseph Faiella.   *See* Pl.'s Ex. 11, ECF No. 132-12 at 1–3 ("Moscony E-mail 5/7/18").

Three days after she disclosed her diagnosis, Plaintiff received a verbal warning for poor performance.  Pl.'s Ex. 19, ECF No. 134-2 ("Sealed Verbal Warning 5/10/18").  Plaintiff submitted a reasonable accommodation request, which was granted in part on June 27, 2018. Pl.'s 56(a)(2) Stmt. ¶ 17.  At the end of the summer, Plaintiff received a written warning for poor performance; this warning stated that she only averaged 16.1 calls per week but was expected to make 22 calls per week. Pl.'s Ex. 25, ECF No. 134-4 ("Sealed Written Warning 5/31/18"). (An Essential Job Functions Chart for Plaintiff's

position, dated June 8, 2018, does not mention an in-person sales call requirement. *See* Pl.'s Ex. 21, ECF No. 132-16 at 1–3 ("VDC II Essential Job Functions 6/8/18").)

Plaintiff took short term disability leave on September 11, 2018, and, once it ran out, remained out on FMLA leave.  Pl.'s 56(a)(2) Stmt. ¶ 20.  In December 2018, Plaintiff completed LINA's reasonable accommodation paperwork.  Her health care provider, Charisse Litchman, M.D., submitted the requisite Fitness for Duty form, indicating Plaintiff could return to work December 20 with several restrictions.  *See* Pl.'s 56(a)(2) Stmt. ¶ 22–24.  In relevant part, Dr. Litchman opined that Plaintiff must be limited to no more than 10 to 15 in-person sales calls per week.  *See id*.

Plaintiff and IDEXX subsequently went through the ADA interactive process.  *Id*. On December 21, IDEXX proposed alternative accommodations, including a gradual "ramp-up" to 20 to 25 weekly in-person sales calls over the course of several weeks.  *Id*. ¶ 29.  By mid-January 2019, Dr. Litchman clarified that Plaintiff patient could not return under IDEXX's proposed conditions.  *Id*. ¶¶ 31–33.  LINA facilitated each side's receipt of the other's communications.  *Id*. ¶¶ 29–33.

On February 11, 2019, Plaintiff's new supervisor, Justin Van Deinse, sent Plaintiff an e-mail with two proposed options for accommodations, both with different "ramp-up" schedules that required Plaintiff to make 20 to 25 weekly in-person sales calls by Monday, February 25, 2019.  *Id*. ¶ 36.  One option required Plaintiff to return to work on Tuesday, February 12 and do administrative work the remainder of that week, to perform 10 to 20 in-person sales calls the second week, and to perform 20 to 25 in-person sales calls the third week.  Pl.'s Ex. 57, ECF No. 132-27 at 1–2 ("Van Deinse E-mail 2/11/19").  The second option contemplated a return date of Wednesday, February 20 with full territory

coverage that week.  *Id.*  In this e-mail, Van Deinse informed Plaintiff that IDEXX would begin its search for her replacement if she did not make 20 to 25 sales calls by February 25.  *Id.*  After some e-mail exchange and with IDEXX's resulting permission, Plaintiff was approved to return to work on Monday, February 18.  *Id.* ¶ 39; Pl.'s Ex. 34, ECF No. 132-21 at 9–14 ("Blanchard E-mail 12/19/18") (prohibiting return until fitness for duty form is complete); Pl.'s Ex. 58, ECF No. 132-27 ("Van Deinse E-mail 2/13/19") (permitting return to work on 2/18/19).

Plaintiff visited Dr. Litchman's office on February 20, 2019.  *See* Pl.'s Ex. 67, ECF No. 134-13 at 7–9 ("Sealed Second Moscony E-mail 2/25/19").  Dr. Litchman wrote a letter that day specifying Plaintiff required a three-week in-office ramp up period and a restriction of 10 to 15 in-person visits per week.  *See id.*

On February 25, 2019, at 3:04 PM, Douglas Perry, the Senior Area Sales Director for the East, sent Plaintiff an updated written warning (revising the August 2018 written warning).  *See* Pl.'s Ex. 62, ECF No. 134-12 ("Sealed Written Warning, Revised 2/15/19").  Shortly after 5:00 PM, Plaintiff sent IDEXX two e-mails.  In the first e-mail (sent 5:14 PM), Plaintiff informed Rebecca Blanchard of Human Resources that she believed IDEXX was subjecting her to discrimination, harassment, and retaliation on the basis of her disability.  *See* Pl.'s Ex. 63, ECF No. 132-29 ("First Moscony E-mail 2/25/19").  She also explained that she had a call earlier that day with Perry and Van Deinse in which they told her they "have been actively recruiting for [her] replacement…."  *Id.*  In the second e-mail (sent 5:32 PM), Plaintiff sent Sean Siebert, Leave of Absence Program Manager, a new accommodation request, attaching Dr. Litchman's February 20 letter.  *See* Sealed Second Moscony E-mail 2/25/19.

Van Deinse e-mailed Plaintiff a memorandum on March 4, 2019.  Pl.'s 56(a)(2) Stmt. ¶ 48.  IDEXX approved some of the accommodation requests but remained firm that it would not approve 10 to 15 weekly in-person sales calls on the grounds it was "not a reasonable accommodation given that it is an essential function to have 20-25 face to face visits each week."  Def.'s Ex. H at 1, ECF No. 129-15 ("Van Deinse E-mail 3/4/19"). IDEXX also refused to provide additional ramp-up time "due to business needs."  *Id*. at 2. IDEXX further explained: "If you and your doctor believe that you can perform 20-25 face to face customer visits and work with no additional ramp-up time, updated medical will be needed to support this.  If you are unable to perform the essential functions of your job as listed above, we will be moving forward with filling your position on Friday, 3/8/19."  *Id.* Lastly, IDEXX informed Plaintiff it would keep her employee status and permit her to apply for open positions until April 12, 2019.  *Id.*

On March 8, 2019, IDEXX filled Plaintiff's position with an internal hire, placed Plaintiff on unpaid leave, and gave her 30 days to apply for open positions.  *See* Blanchard Decl. ¶ 16, ECF No. 129-3; Pl.'s Ex. 81, ECF No. 132-25 at 1–2 ("Siebert E-mail 3/11/19"); Pl.'s 56(a)(2) Stmt. ¶ 52.  On March 26, 2019, Plaintiff's physician released her from the 10 to 15 in-person sales call restriction.  *See id*. ¶ 55.

In early April, Plaintiff applied for another sales position and received an interview, but it was cancelled and she was not hired.  *See id.* ¶ 59; Def.'s Ex. D at 167:2–20, ECF No. 129-11 ("Blanchard Dep.").   According to Blanchard, Plaintiff "was not eligible because that position related to the performance warnings she had received and the interview was cancelled."  Blanchard Decl. ¶ 20; *see also* Blanchard Dep. at 167:2–20 ("It was a sales role that was directly related to the performance that she was being managed

on.  And she would not have been eligible for that role.").  Blanchard could not recall if Plaintiff was eligible for any sales positions.  *See* Blanchard Dep. at 167:2–20.

On April 12, 2019, IDEXX changed Plaintiff's status from unpaid leave to terminated for "Failure to Return from Leave of Absence."  Pl.'s Ex. 82, ECF No. 132-35 at 3–4 ("Blanchard E-mail 4/12/19").

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists."  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citations omitted).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.*  The court must disregard all evidence favorable to the moving party that the jury is not required to believe.  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).  "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."  *Id.* (citing Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir.

2011)).  "[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'"  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)).  Instead, the party opposing summary judgment must set forth in its response "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted."  *Brown*, 654 F.3d at 358 (internal quotation marks omitted).

At summary judgment, the judge's function is "not to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue" of material fact best left for determination by a jury at trial.  *Anderson*, 477 U.S. at 249.

## III.   <u>DISCUSSION</u>

Defendants only move for summary judgment on Counts Six and Seven: the negligent infliction of emotional distress claim against IDEXX and the CFEPA aiding and abetting claim against LINA.  Plaintiff opposes the motion in its entirety.

### A.   <u>Count Six: Negligent Infliction of Emotional Distress</u>

A plaintiff establishes a negligent infliction of emotional distress claim when the evidence presents a triable issue of fact that the defendant "should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily injury."  *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 446 (2003).  Courts typically break down a negligent infliction of

emotional distress claim into four elements: (1) the (un)reasonableness of the risk of emotional distress, (2) the foreseeability of distress, (3) the severity of distress, and (4) causation.  *See Grasso v. Connecticut Hospice, Inc.*, 138 Conn. App. 759, 771 (2012). Here, the parties dispute each of the four elements.

In an employment action, liability for a defendant's unreasonable conduct is limited to "the termination process."  *Morris v. Hartford Courant Co.*, 200 Conn. 676, 682 (1986). While the Supreme Court of Connecticut has not clearly articulated how to define the "termination process," it has explained the type of conduct that is *not* actionable: "conduct occurring within a continuing employment context."  *Perodeau v. City of Hartford*, 259 Conn. 729, 762–63 (2002).   Examples of "routine employment-related conduct" that "individuals reasonably should expect" include:

> performance evaluations, both formal and informal; decisions related to such evaluations, such as those involving transfer, demotion, promotion and compensation; similar decisions based on the employer's business needs and desires, independent of the employee's performance; and disciplinary or investigatory action arising from actual or alleged employee misconduct.

*Id.* at 757.  The Supreme Court of Connecticut's policy reasons for a "termination process" limitation are three-fold.   First, a workplace might become "less vigorous and less productive" if employees in ongoing relationships feared lawsuits when they distressed their colleagues, whereas a threatened lawsuit is not useful in the termination process. *Id.* at 758.  Second, the "inherently competitive and stressful nature of the workplace" combined with the difficulty in proving emotional distress might "open the door to spurious claims." *Id.*   Third, sister states use narrower negligent infliction of emotional distress standards, supporting the *Perodeau* court's conclusion that "the societal costs of allowing

claims for negligent infliction of emotional distress in the context of ongoing employment are unacceptably high." *Id.* at 761.

The parties dispute what event initiated the termination process. Defendants contend that the termination process began on March 8, 2019, when IDEXX replaced Plaintiff with an internal hire. *See* MSJ Mem. at 16, ECF No. 129-1. Plaintiff argues the termination process started sooner when she "sought to return with an accommodation." Opp'n at 15. This court concludes that the moment when the "termination process" began is a question for the jury to decide. *See Leach v. F.A. Bartlett Tree Expert Co.*, 112 F. Supp. 2d 230, 232 (D. Conn. 2000) (explaining "the jury's interpretation of the evidence" would be required to evaluate the actionable emotional distress where it was "unclear when the termination process began").

As the court explained in *Carter v. MetLife Group Incorporated*, "[m]ost courts … include the events immediately leading up to, and immediately following, the termination of the employee" and they "have by and large declined to extend the 'termination process' to events weeks or months before the termination of employment." No. 3:23-CV-00684 (SVN), 2023 WL 8476211, at *10 (D. Conn. Dec. 7, 2023) (collecting cases). This observation reflects the fact that most termination processes take place over a short period of time and are often unrelated to other ongoing employment events. *See id.*

However, such a narrow determination does not necessarily apply to cases where the plaintiff is on disability or medical leave. For example, in *Chen v. Pitney Bowes Corporation*, 195 F. Supp. 2d 368 (D. Conn. 2002), the court denied summary judgment on the grounds that "a jury could conclude that [defendant] is liable to [plaintiff] for negligent infliction of emotional distress based on its conduct surrounding Chen's

disability leave and his return to work and the method of his termination." *Id.* at 378.  As another example, the court in *Copeland v. Home and Community Health Services, Incorporated*, 285 F. Supp. 2d 144, 153 (D. Conn. 2003) denied a defendant's motion to dismiss where: the plaintiff alleged she repeatedly told her supervisor about her health conditions; for over a month, the defendant pressured her to return to work by being inflexible about her return date; the defendant threatened to replace her; and it ultimately followed through on its threat when she did not return from leave.  In other words, these cases support a finding that a termination process can begin when a plaintiff is on leave.

Turning back to *Perodeau*, the phrase "termination *process*" suggests the Supreme Court of Connecticut intended to give courts flexibility when evaluating actionable conduct, so long as the events are in some way connected to, and ultimately culminate in, the termination.  *See Process*, Merriam-Webster Dictionary Online (updated Jan. 21, 2024), available at https://www.merriam-webster.com/dictionary/process (last visited Feb. 4, 2024) (defining "process," in relevant part, as "a series of actions or operations conducing to an end"); *see also Bimler v. Stop & Shop Supermarket Co.*, No. 110028, 2003 WL 356711, at *12 (Conn. Super. Ct. Jan. 22, 2003) ("If *Perodeau* meant to confine termination to the simple act of firing someone under humiliating circumstances where the firing occurs at a defined date and time[,] why use the words 'termination *process*' and why not say no such suits would be allowed in the employment context 'prior to termination' as opposed to language 'used no such suits based on conduct occurring within a *continuing* employment context'?") (emphasis in original).  Indeed, the *Perodeau* policy concerns are not implicated when an employer begins the termination while the employee is on leave, because that employee does not have ongoing relationships with

other employees, or with the workplace, generally, and there is no competition or stress from the workplace that would serve to inspire spurious claims.  Such flexibility prevents an employer from escaping liability when it has decided to terminate the employee, but when it nevertheless remains willing to "play the long game" (or circumstantially does so).

Ultimately, the court must "focus[ ] on the manner of discharge."  *Mercado v. Prrc, Inc.*, No. 3:15cv637 (JBA), 2015 WL 6958012, at *5 (D. Conn. Nov. 10, 2015).  An employer acts unreasonably when the termination is "done in an inconsiderate, humiliating or embarrassing manner."[2]  *Mumma v. Pathway Vet Alliance, LLC*, 648 F. Supp. 3d 373, 400 (D. Conn. 2023).  Under this standard, a jury could conclude that IDEXX acted unreasonably, regardless of which events it concludes to have taken place within "the termination process."

Assuming, for example, that the termination process began March 8, 2019, as Defendant contends, a reasonable jury could conclude that IDEXX: replaced Plaintiff before it had given her a "final written expectation summary," as reflected on the expectation summary paperwork, *see* Second Written Warning, Revised 2/25/19; told Plaintiff she could apply to other jobs but then refused to consider her for them, due to her "poor performance," *see* Pl.'s Ex. 78, ECF No. 132-33 at 6–8 ("Moscony E-mail 3/8/19"), *see also* Pl.'s Ex. 79, ECF No 132-33 at 9–10 ("Moscony E-mail 3/26/19"); cancelled the only interview she received, *see* Blanchard Decl. ¶ 20; and then terminated

---

[2] While the Supreme and Appellate Courts of Connecticut have not adopted (or rejected) this language, state and federal trial courts have long considered whether the termination process was "inconsiderate, humiliating or embarrassing."  *See, e.g., Dionne v. Trinity Health of New England, Corp., Inc.*, HHD-CV20-6128083-S, 2022 WL 1020385, at * 2 (Conn. Super. Ct. Feb. 10, 2022); *Corcoran v. G&E Real Estate Mgmt. Servs., Inc.*, 484 F. Supp. 3d 42, 53 (D. Conn. 2020); *Mercado*, 2015 WL 6958012, at *5; *Contois v. Anthony Restaurant Grp. LLC*, No. CV000160287, 2001 WL 195396, at *5 (Conn. Super. Ct. Feb. 2, 2001); *Lund v. Stern & Co., Inc.*, No. CV 94-0463413, 1995 WL 216846, at *1 (Conn. Super. Ct. Apr. 4, 1995).

her for "failure to return from leave" when she had expressed a desire to return from leave but was stonewalled when she applied for another position, *see id.* ¶ 21, *see also* Blanchard E-mail 4/12/19, Pl.'s Ex. 80, ECF No. 132-34 ("Moscony E-mail 3/30/19").

Assuming further that the termination process began when Plaintiff attempted to return from leave, as she posits, a jury also reasonably could conclude that Defendants: unreasonably prevented her from returning after she expressed a desire to return, *see* Blanchard E-mail 12/19/18; restricted her "ramp-up" period to an unreasonably short time period, *see* Van Deinse E-mail 2/11/19; threatened to replace her if she did not achieve 20 to 25 in-person sales calls within an unreasonably short time period, *see id.*; told her they were looking for her replacement while she was on leave, *see id.*; issued a revised written warning they already had given her, *see* Sealed Written Warning, Revised 2/15/19; refused to adjust the date she would be replaced, notwithstanding her best efforts to obtain follow-up medical information and to meet her clients' needs, *see* Pl.'s Ex. 74, ECF No. 132-32 at 22–24 ("Moscony E-mail 3/7/19"); and failed to communicate with her the day before she was replaced, *see* Pl.'s Ex. 75, ECF No. 132-32 at 5 ("Moscony E-mail 3/8/19").

A jury could find such conduct to be "inconsiderate, humiliating or embarrassing," regardless of the start date of the termination process, and even if the parties were to agree that IDEXX first flagged Plaintiff's allegedly deficient performance in April of 2018. That is, a jury could conclude IDEXX unreasonably suggested Plaintiff's position and others similar to it might be attainable, when either it had no intention of allowing her to realize those opportunities, or there was no practicable way for her to obtain another one, and then that IDEXX terminated her for failing to return when she begged to keep her job.

*See Chen*, 195 F. Supp. 2d at 378 (denying summary judgment based on defendant's conduct during leave, plaintiff's attempt to return to work, and termination); *Copeland*, 285 F. Supp. 2d at 153 (denying motion to dismiss where defendant was inflexible about return date, threatened to replace plaintiff, and replaced her); *see also Leach*, 112 F. Supp. 2d at 232 (denying motion to dismiss where employer's letters requiring a physician to complete "fit for duty" and "release" before returning to work and caveating a position may not be available on return could have been "aimed toward ultimately terminating [plaintiff]").[3]

As for Plaintiff's emotional distress, its magnitude, foreseeability, and causation, is a question for the jury to decide.  *See Leach*, 112 F. Supp. 2d at 232 ("Obviously, the jury's conclusion as to whether the emotional distress was inflicted beyond the mere fact of termination of the plaintiff's employment will depend upon the jury's interpretation of the evidence.").  Defendants suggest that Plaintiff did not suffer emotional distress because she had pre-existing anxiety and depression diagnoses and is still able to work.  *See* MSJ Mem. at 19–20.  The law does not require a person to be free of diagnoses before suffering emotional distress, nor does it require a person to be completely disabled after suffering emotional distress.  *See Edwards v. Cmty. Enter., Inc.*, 251 F. Supp. 2d 1089, 1106 (D. Conn. 2003) ("Although [plaintiff] did not see any physicians or psychiatrists as a result of the alleged emotional damage, she could still recover general

---

[3] Defendants cite a long list of cases it believes falls short of "inconsiderate, humiliating or embarrassing" conduct.  *See* MSJ Mem. at 17–18.  Almost each of these cases is factually distinct from the one at bar. The most analogous is *Belanger v. Commerce Clearing House, Inc.*, 25 F. Supp. 2d 83, 85 (D. Conn. 1998), a case in which the court dismissed the plaintiff's negligent infliction of emotional distress claim because the pleadings merely claimed that "after stating that it would consider plaintiff for an open position in sales, defendant eliminated plaintiff's position and terminated her."  When construed in Plaintiff's favor, the claims in the present case go beyond the pleadings in *Belanger*.

emotional damages.") (internal citations removed). Moreover, Defendants cite cases that are factually distinct and that lacked evidence presented by Plaintiff here. *See, e.g., Frutkin v. Wal-Mart Stores, Inc.*, No. 3:07-cv-00899 (WEE), 2008 WL 934908, at *3 (D. Conn. Apr. 7, 2008) (granting motion to dismiss where the only fact concerning the termination was that another employee witnessed it in a private office); *Forgione v. Skybox Barber Lounge, LLC*, No. CV146050777S, 2016 WL 1265639, at *4 (Conn. Super. Ct. Mar. 2, 2016) (granting summary judgment because plaintiff, who had worked for the employer for two weeks, failed to present evidence—including through her deposition testimony or through medical records—that defendant's conduct "made her more depressed and/or ill"). This court concludes the letters from Plaintiff's treatment providers would support a juror's conclusion that IDEXX's conduct caused her anxiety and depression symptoms to worsen. *See* Pl.'s Ex. 95, ECF No. 134-19 at 1–3 ("Sealed Hersh Ltr. 9/29/22"); Pl.'s Ex. 96, ECF No. 134-19 at 4–6 ("Sealed Poster Ltr. Undated").

Accordingly, the court finds there is a triable issue of fact as to each of the four elements of Plaintiff's negligent infliction of emotional distress claim. Namely, a reasonable juror could find IDEXX's conduct during the termination process to have been unreasonable, that Plaintiff's emotional distress was foreseeable, that her emotional distress was sufficiently severe, and that IDEXX's conduct caused her emotional distress. *See Carrol*, 262 Conn. at 448. Therefore, as to Count Six, summary judgment is **DENIED**.

**B.**    <u>**Count Seven: Aiding and Abetting**</u>

Section 46a-60(b)(5) of the General Statutes of Connecticut makes it unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or to

attempt to do so." The CFEPA's definition of "person" includes corporations, like LINA. *See* Conn. Gen. Stat. § 46a-51(14). In general, a defendant "aids or abets" discriminatory practices when it "helps or compels another to act in a discriminatory manner." *Tyszka v. Edward McMahon Agency*, 188 F. Supp. 2d 186, 195 (D. Conn. 2001); *see also Bolick v. Alea Grp. Holdings, Ltd.*, 278 F. Supp. 2d 278, 282 (D. Conn. 2003) ("CFEPA aiding and abetting liability thus requires that the individual assists another person in discriminatory conduct….").[4]

The parties did not cite, and the court is not aware of, any CFEPA case in which the alleged "aider and abettor" defendant functioned as the employer's third-party administrator of medical leave and accommodations programs. The most analogous case is one cited by Plaintiff—*Jansson v. Stamford Health, Incorporated*, No. 3:16-cv-260 (CSH), 2018 WL 1756595 (D. Conn. Apr. 11, 2018)—in which one of the alleged "aider and abettor" defendants, VantagePoint, provided third-party human resources and management services to the employer defendant. There, the court concluded the plaintiff properly alleged an "aiding and abetting" CFEPA claim, because she alleged VantagePoint's two employees served as human resources "representatives" and "participated in some of the meetings, investigations, and decisions that ultimately led to Plaintiff's allegedly discriminatory termination." *Id.* at *3. In other words, VantagePoint's

---

[4] Courts occasionally have used an "aid or abet" definition articulated in *Bogdahn v. Hamilton Std. Space Sys, Int'l*, 46 Conn. Supp. 153, 159 (Conn. Super. 1999): a defendant may "aid or abet" when the conduct "ratified, endorsed, and perpetrated" the discriminatory conduct of another. *See, e.g., Schaefer v. Gen. Elec. Co.*, No. 3:07–cv–858 (PCD), 2008 WL 2001244, at *4 (D. Conn. May 8, 2008); *Tyszka*, 188 F. Supp. 2d at 195; *Wasik v. Stevens Lincoln-Mercury, Inc.*, No. CIV. 3:98CV1083 (DJS), 2000 WL 306048, at *7 (D. Conn. Mar. 20, 2000). The *Bogdahn* definition is derived from the plaintiff's pleadings, not jurisprudence. Accordingly, the court will not use the *Bogdahn* definition, as the "helps or compels" definition is sufficient for the purpose of this case.

role in meetings, investigations, and decision helped or facilitated the employer's termination decision.

Plaintiff argues that LINA similarly "facilitated" the accommodation process by serving as "the resource through which IDEXX received advice and had questions addressed in the process; through which plaintiff communicated to IDEXX various concerns and issues; and through which plaintiff's doctor exclusively communicated." Opp'n at 14. Still, *Jansson* is distinguishable.  A third-party administrator that serves as an information resource and/or functions as a liaison between employer and employee does not, without more, "help" an employer make the allegedly discriminatory decisions. It is just as likely that an employer would take the information provided by the third-party administrator to make an employment decision that does not violate the law.  The *Jansson* plaintiff survived the motion to dismiss stage precisely because VantagePoint did *more* than provide resources—it participated in meetings, investigations and decisions that led to unlawful termination.  LINA did not do so here.

After reviewing the evidence, the court concludes that no reasonable jury would conclude LINA "helped or compelled" IDEXX's allegedly unlawful employment decisions. The parties seem to agree, and the record is clear, that with respect to Plaintiff's request for a reasonable accommodation, LINA's role was to gather information from the plaintiff and her medical provider(s), and to give it to IDEXX so that IDEXX could engage in the interactive process and determine an accommodation.[5]  Indeed, once Plaintiff began the

---

[5] The record indicates LINA controlled the short- and long-term disability process, the personal time off process, FMLA eligibility, and associated appeals.  *See* Pl.'s Ex. 53, ECF No. 132-26 at 6–17; Pl.'s Exs. 85–88, ECF No. 132-36 (IDEXX's STD/LTD, FMLA, and ADA reasonable accommodation policies).  LINA's control of these processes are unrelated to the alleged unlawful conduct in this case.

accommodation process, LINA sent IDEXX an e-mail on June 11, 2018, including the following disclaimer and information:

> Life Insurance Company of North America (LINA) is not providing you with legal advice and is not engaging in the ADA interactive process with individuals requesting reasonable accommodations.  You, as the employer, have ultimate authority on whether to provide a reasonable accommodation where required by law, and, if so, determining what accommodation should be provided.  Note the ADA limits what information an employer can use in the ADA process.  You agree to use any information provided by LINA in accordance with the ADA and other applicable law.
>
> We have received a completed ADA Accommodation Form and have enclosed this to use as you engage in the interactive process with your employee in determining what, if any reasonable accommodation to provide.  Please reply to this email within 7 calendar days and inform Cigna of the outcome of the interactive process.

Pl.'s Ex. 17, ECF No. 134-1 at 11–20 ("Sealed Gerrard E-mail 6/11/18").  Unlike the *Jansson* allegations, the record indicates that LINA processed Plaintiff's short-term disability and FMLA leave, but never participated in IDEXX's "meetings, investigations, and decisions" about the interactive process, the reasonable accommodation decision, or the alleged decision to retaliate against Plaintiff for taking leave.  *See, e.g.,* Pl.'s Ex. 26, ECF No. 134-5 ("Sealed LINA E-mail 9/11/18") (automated LINA e-mail); Pl.'s Exs. 28–30, ECF No. 134-6 ("Sealed LINA E-mails 9/18/18, 10/4/18, 11/28/18") (automated LINA e-mails); Pl.'s Ex. 40, ECF No. 132-24 at 4–7 ("Siebert Notes") (indicating LINA did nothing more than relay information); Pl.'s Ex. 43, ECF No. 132-24 at 13–14 ("Moscony E-mail 1/15/19") (Moscony communicating with LINA); Pl.'s Exs. 44–45, ECF No. 132-24 at 15–18 ("Perry E-mails 1/16/19") (IDEXX employees discussion about rejecting Plaintiff's proposed accommodation and creating business impact analysis); Pl.'s Exs. 47–51, ECF No. 132-25 ("IDEXX E-mails 1/21/19–1/30/19") (LINA not CC'd during business impact analysis revision process); Van Deinse E-mail 2/11/19; Van Deinse E-

mail 2/13/19; Pl.'s Ex. 59, ECF No. 132-27 at 9–15 ("Blanchard E-mail 2/12/19") (IDEXX discussing accommodation with Plaintiff); Pl.'s Ex. 93, ECF No. 132-39 ("Gerrard E-mail 2/25/19") (LINA explains it requires IDEXX intervention to "suppress" information normally sent through the standard process, and it cannot "suppress" ADA eligibility letters even if requested).

The only document that suggests LINA may have participated in the reasonable accommodation process is an e-mail from Siebert to Blanchard.  On December 28, 2018, he wrote: "I expect that during my absence we will get a response from Cigna regarding our proposed alternative accommodations for Jodie Moscony," adding, "I can share the response so we can begin working on next steps."  Pl.'s Ex. 39 at 3, ECF No. 132-24 ("Blanchard E-mail 1/2/19").  While on its face this e-mail may suggest LINA's active participation, a careful reading of the evidence suggests otherwise.  Justin Van Deinse's notes from early January 2019 indicate that the awaited "response" from LINA was whether Plaintiff's health care provider concluded IDEXX's proposed accommodation was reasonable; this is merely information-sharing.  *See* Pl.'s 56(a)(2) Stmt. ¶ 32; Pl.'s Ex. 70 at 2–4, ECF No. 132-32 ("Van Deinse Notes").  Ultimately, Plaintiff directly informed IDEXX that she rejected the proposed accommodation. *Id.* at 3.  Indeed, LINA's information-passing role ceased on January 10, 2019, when Alicia Troski of LINA stated, "Further discussions in regards to return to work needs, as they relate to her job duties and schedule, will need to occur between Jodi, her provider, and her employer as part of the interactive process as she no longer has an active STD file …." *Id.* at 4.  While Siebert testified that IDEXX, by "group consensus," ultimately chose not to re-engage in the interactive process, there is nothing in the record to suggest LINA was part of that group.

*See* Pl.'s Ex. 7 at 112:14–22, ECF No. 132-9 ("Siebert Dep."); *Robinson*, 781 F.3d at 44 (prohibiting a party from relying on speculation to defeat summary judgment).  Based on the evidence, summary judgment is **GRANTED** as to Count Seven.

### IV.    <u>CONCLUSION</u>

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Summary Judgment is **DENIED** as to Count Six against IDEXX.

2. Summary Judgment is **GRANTED** as to Count Seven against LINA.  LINA is **DISMISSED** from this case.

3. Counts One through Six are ready to proceed to trial.  Within 24 days of this ruling, Plaintiff and Defendant IDEXX shall e-file a joint status report indicating:

   a. The estimated length of trial;

   b. Whether the parties would like to resume their settlement conference with Judge Vatti; and

   c. Whether the parties consent to referral to a (different) Magistrate Judge for a bench **or jury trial** in this matter (pursuant to Local Rule 73), which might well result in trial being scheduled sooner than with the undersigned.

Thereafter, the court will issue such referral(s), or will schedule the matter for trial and will issue corresponding instructions and deadlines.

**IT IS SO ORDERED** in Hartford, Connecticut, this 6th day of February, 2024.

```
              /s/
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE
```